OPINION OF THE COURT
Patrick J. McGrath, J.
*257 In this controversy over an insurance contract, the defendant Rensselaer County moves to dismiss the action pursuant to CPLR 3211 (a) (1) and/or (7) to the extent that plaintiff insurance company seeks any amount beyond one $10,000 deductible. The plaintiff insurance company cross-moves for summary judgment (CPLR 3212), and a declaration that (1) the County owes Selective a separate deductible for each underlying class action plaintiff, and (2) attorney’s fees and expenses incurred in the underlying action must be allocated ratably to each underlying class action plaintiff for purposes of calculating the amount owed by the County under each deductible.
As a threshold matter, the court notes that issue has not been joined, but that plaintiff has moved for summary judgment. CPLR 3211 (c) empowers the court to treat defendant’s motion as one for summary judgment if the proof before the court now is as complete as it would be on a summary judgment motion. (Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, CPLR C321L44.) Prior to issuing this decision, the court informed the parties that it appeared as though the ultimate issue of both motions was the interpretation of an insurance policy, a purely legal question. The facts and arguments submitted indicated that the parties were “charting a summary judgment course.” (Four Seasons Hotels v Vinnik, 127 AD2d 310, 320 [1st Dept 1987].) The court gave notice to the parties regarding its intent to convert the 3211 motion to one for summary judgment in order to give defendant an “opportunity to make an appropriate record.” (Mihlovan v Grozavu, 72 NY2d 506, 508 [1988], citing Rovello v Orofino Realty Co., 40 NY2d 633, 635 [1976].) The defendant has informed the court that it has no further evidence to submit, and has no objection to converting its motion into one for summary judgment.
Summary judgment
“shall be granted if, upon all the papers and proof submitted, the cause of action . . . shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party . . . [T]he motion shall be denied if any party shall show facts sufficient to require a trial of any issue of fact.” (CPLR 3212 [b].)
Movants have a prima facie burden of submitting proof, in evidentiary form, sufficient to demonstrate that there is an absence of any material issue of fact. (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851 [1985]; Zuckerman v City of New *258 York, 49 NY2d 557 [1980]; Davenport v County of Nassau, 279 AD2d 497 [2d Dept 2001].) If the movant meets this burden, then the burden shifts to the opponent to produce evidentiary proof to demonstrate the existence of a triable issue of fact. (See Davenport v County of Nassau.) Summary judgment is a drastic remedy and should not be granted where there is any doubt as to the existence of a triable issue. (Rotuba Extruders v Ceppos, 46 NY2d 223 [1978].) With these principles in mind, the court turns to the merits.
On or about June 27, 2002, Nathaniel Bruce and several other named plaintiffs brought a class action against Rensselaer County in the United States District Court for the Northern District of New York. Plaintiffs were seeking damages for individuals who were strip-searched at the Rensselaer County Jail on or after June 26, 1999 after being arrested for or charged with petty crimes. The action alleged that for the previous 12 years, the Rensselaer County Sheriffs Department had implemented a policy of strip-searching everyone placed in the County Jail, despite a well established holding in the Second Circuit that individuals charged with such petty offenses cannot be strip-searched absent particularized suspicion that they possess weapons or contraband. (See Shain v Ellison, 273 F3d 56, 59 [2d Cir 2001].)
Selective Insurance had issued four consecutive police professional liability policies to the County for policy periods spanning from January 1, 1999 through January 1, 2003, which each contained a deductible of $10,000 or $15,000. Each policy contained a deductible condition which provided as follows:
“a. Our obligation under Section I Coverage A and Coverage B to pay damages on behalf of the insured applied only to the amount of damages in excess of any deductible amount stated in the Declarations.
“b. The deductible amount stated in the Declarations, if any, applies to all damages because of bodily injury, property damages and personal injury sustained by one person or organization as the result of any one occurrence.
“c. The deductible amount stated in the Declarations applies to each occurrence and includes loss payments and adjustment, investigative and legal fees and costs, whether or not loss payment is involved.
“d. The terms of this insurance, including those with respect to (1) our right and duty to defend any *259 suits seeking damages, and (2) your duties in the event of an occurrence claim or suit apply irrespective of the application of the deductible amount.
“e. We may pay any part or all of the deductible amount to effect settlement of any claim or suit and upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid to us.”
An “occurrence” is defined as an
“event, including continuous or repeated exposure to substantially the same general harmful conditions, which results in ‘bodily injury’, ‘personal injury’, or ‘property damage’ by any person or organization and arising out of the insured’s law enforcement duties. All claims arising out of (a) a riot or insurrection, (b) a civil disturbance resulting in an official proclamation of a state of emergency, (c) a temporary curfew, or (d) martial law are agreed to constitute one occurrence.”
Selective agreed to defend the County against the Bruce action under the above-cited policies pursuant to a reservation of rights letter wherein Selective stated that it would provide indemnification “subject to the limits of the policy and the deductible.”
The Bruce plaintiffs failed to timely move for class certification, and certification was denied. Counsel prosecuting the Bruce action subsequently brought a substantially identical class action (the Kahler action), with Paul Adam Kahler as class representative. The Bruce action was subsequently consolidated with the Kahler action. Selective agreed to defend this action, and its third-party administrator issued a reservation of rights letter, again stating that Selective would provide indemnification “subject to the limits of the policy and the deductible.”
On March 11, 2004, the parties to the Bruce and Kahler action entered into a settlement agreement. The plaintiffs then moved for approval of the class action settlement and for attorney’s fees. The motion was granted in part and denied in part, with the court certifying the class, approving the payment of $1,000 for each of the 806 class members, allowing an incentive fee of $5,000 for Mr. Bruce only, and allowing attorney’s fees, litigation expenses and administrative costs of $442,701.74 to the plaintiffs. In total, Selective paid $811,000 *260 to the underlying plaintiffs. Selective paid its own counsel $314,551.30 in legal fees and other costs in connection with the defense of the underlying actions. AJ1 told, it appears that the plaintiff expended approximately $1.6 million in defending the consolidated actions. When 806 claims are multiplied by a $10,000 deductible, the result is more than the actual $1.6 million spent in defending the lawsuit. As such, on January 24, 2008, Selective wrote to the County demanding that the County reimburse Selective for the amount of the settlement of the underlying action, along with the legal fees and costs incurred in defending the action. The County refused to pay anything more than a single $10,000 deductible.
Consequently, plaintiff brought this action, and claims that the County owes a separate deductible for the payments made to each class action plaintiff. Additionally, the allowance of attorney’s fees, litigation expenses, and administrative costs incurred in defending the action is included in those deductibles, and should therefore be apportioned among the class action plaintiffs for determining the amount owed by the County under the deductibles. The County argues that the underlying wrong was carried out by a single de facto policy, and that the policy is a single “occurrence” within the meaning of the insurance policies. As such, the County argues that the plaintiff is entitled to a single deductible of $10,000. Further, the plaintiff has not identified any part of the underlying insurance policies to justify allocating attorney’s fees and costs to each claimant pro rata. The County argues that the policies’ silence on this issue is an ambiguity to be construed against the drafters, and that all of the attorney’s fees and costs arising out of the action should be attributed to the named claimant, Mr. Bruce.
The Deductibles
“When addressing an insurance coverage dispute, a court looks first to the language of the policy.” (Travelers Indem. Co. v Commerce & Indus. Ins. Co. of Can., 36 AD3d 1121, 1122 [3d Dept 2007].) “[U]nambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court.” (Vigilant Ins. Co. v Bear Stearns Cos., Inc., 10 NY3d 170, 177 [2008], quoting White v Continental Cas. Co., 9 NY3d 264, 267 [2007].) “It is well settled that [a] contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no *261 reasonable basis for a difference of opinion.” (White at 267 [internal quotation marks omitted], quoting Greenfield v Philles Records, 98 NY2d 562 [2002].) The test for ambiguity is whether the language of the insurance contract is “susceptible of two reasonable interpretations.” (State of New York v Home Indem. Co., 66 NY2d 669, 671 [1985]; Essex Ins. Co. v Pingley, 41 AD3d 774, 776 [2d Dept 2007].) Here, the plaintiff must “establish that the words and expressions used not only are susceptible of [a] construction [favorable to the plaintiff] but that it is the only construction that can fairly be placed thereon.” (Hartol Prods. Corp. v Prudential Ins. Co., 290 NY 44, 49 [1943], rearg denied 290 NY 744 [1943].) “The meaning to be given to a contract of insurance must be the meaning that the ordinary businessman would give it.” (Faroll v National Sur. Corp., 26 Misc 2d 548, 551-552 [Sup Ct, NY County 1960].)
On this record, Selective has demonstrated its entitlement to judgment as a matter of law. The deductible condition contains the unambiguous language that “[t]he deductible amount stated in the Declarations, if any, applies to all damages because of bodily injury, property damages and personal injury sustained by one person or organization as the result of any one occurrence.” (Emphasis supplied.)
With the burden shifted, the defendant claims that the above policy provision is ambiguous, specifically, with respect to the term “occurrence.” Defendant notes that New York courts apply the doctrine of contra proferentem, which requires that ambiguities within an insurance contract be resolved “most favorably to the insured and most strictly against the insurer.” (Index Fund, Inc. v Insurance Co. of N. Am., 580 F2d 1158, 1162 [2d Cir 1978] [applying New York law].) Defendant notes that the term “occurrence” is defined as an “event, including continuous or repeated exposure to substantially the same general harmful conditions, which results in ‘bodily injury’, ‘personal injury’, or ‘property damage’ by any person or organization and arising out of the insured’s law enforcement duties.” (Emphasis supplied.) Defendant argues that the phrase “by any person” is ambiguous, as it is not clear if the language refers to the entity causing the occurrence, or the entity sustaining the occurrence. Defendant notes that plaintiff has relied on this language to support its position that a deductible attaches to every plaintiff. The court agrees with defendant’s interpretation that “by any person” refers to the entity causing *262 the injury, especially since this phrase is followed by the words, “and arising out of the insured’s law enforcement duties.” However, this is a distinction without a difference; if either interpretation is used, the meaning of the deductible condition “b,” specifically the words “by one person,” does not change. As noted by the plaintiff, any purported ambiguity in the definition of “occurrence” does not lead to an ambiguity as to whether the deductions apply on a “per claim” basis.
Defendant also argues that when it purchased this insurance, it was reasonable to believe that the civil rights action at issue here would be covered as a single claim with a single deductible. The defendant points to the declarations sheet, which sets forth a separate limit available to each person and a separate limit for each occurrence. Selective notes that it was never its contention that an “occurrence” can only involve a single person, but rather, that on the instant facts, each claimant was injured as the result of a separate “occurrence.” The court finds that if anything, the use of distinct captions for “Each Occurrence,” “Each Person” and “Each Claim” is consistent with the fact that deductibles can apply (1) to a person making a claim or (2) to each occurrence resulting in multiple injuries to a single claimant.
The court agrees that there are certainly instances where an “occurrence” can occur to a single person or multiple people at the same time. While the court does not find that this issue raises an ambiguity in the contract, it implicates the case law on the subject of whether multiple injuries can occur from a single occurrence.
In Appalachian Ins. Co. v General Elec. Co. (8 NY3d 162 [2007]), a manufacturer claimed that for purposes of exceeding annual per occurrence primary insurance policy limits to access excess insurance proceeds, it could group together as a single occurrence numerous personal injury claims arising from the exposure of individuals to asbestos insulation in turbines at work sites across the country. The Court held that in the absence of language indicating some other standard should be applied for the purpose of grouping incidents into a single occurrence, “the unfortunate-event standard governs the outcome.” (Id. at 173.) The Court noted that
“several factors emerge as relevant to distinguishing injuries or losses that arise from a single occurrence as opposed to those that constitute multiple occurrences: whether there is a close temporal and *263 spatial relationship between the incidents giving rise to injury or loss, and whether the incidents can be viewed as part of the same causal continuum, without intervening agents or factors. Common causation is pertinent once the incident—the fulcrum of our analysis—is identified, but the cause should not be conflated with the incident.” (Id. at 171-172.)
The policy at issue in Appalachian was, arguably, less definitive on the question of what constitutes a single occurrence, as it defined that term as “an accident, event, happening or continuous or repeated exposure to conditions which unintentionally results in injury or damage during the policy period.” (Id. at 168.)
Having determined that there were numerous exposure incidents, the Court analyzed the temporal and spatial relationships between the incidents and the extent to which they were part of an undisrupted continuum to determine whether they can, nonetheless, be viewed as a single unfortunate event or a single occurrence. The Court held that
“[e]ven if we were to assume that the continuum element was met here because the exposures share a common cause . . . the scenarios presented would fail the [unfortunate-event] test because of the lack of any spatial or temporal relationship. On this record, it appears that the incidents share few, if any, commonalities, differing in terms of when and where exposure occurred, whether the exposure was prolonged and for how long, and whether one or more GE turbine sites was involved. Under the circumstances, there were unquestionably multiple occurrences and the excess insurers were entitled to a declaration to that effect.” (Id. at 174.)
The Court also rejected GE’s argument that the cause of plaintiffs’ injuries was its failure to warn because it would not transform the cause into the event giving rise to liability for purposes of the per-occurrence limit. The Court held that “focus [ing] only on discerning the common originating cause of multiple events” would not apply the unfortunate-event test but rather the sole-proximate-cause test, which was explicitly rejected in Arthur A. Johnson Corp. v Indemnity Ins. Co. of N. Am. (7 NY2d 222 [1959]). (Appalachian at 172 n 2.)
Defendant argues that the “incident” at issue here was the promulgation of a policy of universal strip searches at the jail. *264 Defendant notes that the complaint in the Bruce action indicated that every plaintiff suffered the same injury (humiliation and mental anguish) at the same location for the same reason. Defendant distinguishes the instant facts from Appalachian, noting that this is not a case where the underlying claimants sustained injuries at 22,000 different sites over a 20-year period, with diverse resulting injuries. Defendant argues that the facts herein are more akin to the release of a hazardous substance, arguing that once the defendant promulgated the policy, “the policy was bound to wreak constitutional havoc” without intervening agents or factors. Defendant claims that this case is similar to Aguirre v City of New York (214 AD2d 692 [2d Dept 1995]), where defendants negligently applied spray paint to a vessel, and the windblown paint covered 40 automobiles owned by the individual plaintiffs, allegedly causing a total of $105,400 in damages. The Court determined the single act which caused the damage to the 40 vehicles constituted a single “occurrence” within the meaning of the policy. Defendant also cites Lavandier v Landmark Ins. Co. (44 AD3d 501 [1st Dept 2007]), where the Court held that because plaintiffs lived in the same apartment, and both were exposed to lead at the same time, this met the “close temporal and spatial relationship” criterion discussed in Appalachian, and constituted a single occurrence. Finally, defendant cites Bethpage Water Dist. v Zara & Sons Contr. Co. (154 AD2d 637 [2d Dept 1989]), wherein the Court found that a single deductible was sufficient where a contractor’s negligent construction of a single sewer system ultimately damaged 250 areas of water mains. The policy in Bethpage contained language that is very close to the instant Selective policies: “the deductible amount applies ... to all damages because of bodily injury sustained by one person, or to all property damage sustained by one person or organization, as the result of any one occurrence.” (Id. at 638.) The Court noted that “although the water mains of Bethpage suffered over 250 items of damage, it is clear that these damages arose out of ‘continuous or repeated exposure to substantially the same general conditions’, i.e., the negligence of Zara in the construction of a single sewer system backfilling the sewer trenches.” {Id.)
The plaintiff argues that its policies do not contain language for grouping the claims asserted in the underlying class action. The policies specifically mention that claims that arise out of riots or insurrection, a civil disturbance resulting in an official *265 proclamation of a state of emergency, a temporary curfew, or martial law constitute one occurrence. The court finds that this indicates an intent that certain types of similar claims be combined, and “civil rights class actions” are not included therein. Plaintiff also notes that its definition of “occurrence” is substantially the same as contained in Appalachian as well as International Flavors & Fragrances, Inc. v Royal Ins. Co. of Am. (46 AD3d 224 [1st Dept 2007]), wherein 30 employees of a corporation that operated a microwave packaging plant claimed that butter flavoring manufactured by plaintiffs and used by the corporation in microwave popcorn contained volatile organic compounds that caused lung impairment and other respiratory system injuries. The Court noted that
“30 victims were continuously and repeatedly exposed to diacetyl. In the absence of policy language making it clear that any and all personal injury resulting from such exposure is to be regarded as a single occurrence, the exposure of the individual claimants to diacetyl on different occasions, extending over different periods of time, supports the finding that these are 30 discrete occurrences. In short, the language employed in the AIG policy definition is insufficient to require the conclusion that the parties intended to aggregate the individual underlying claims in this matter.” (Id. at 232-233 [citation omitted].)
The Court further noted that
“[u]nlike a claim sounding in tort, a contract action does not require the plaintiff to demonstrate injury since nominal damages are available. By comparison, ‘a tort cause of action cannot accrue until an injury is sustained’ and, thus, must be based on actual damages. In the instant matter, the shipment of butter flavoring by IFF presented only the potential for injury; it was the exposure to diacetyl and other volatile compounds, though gradual and continuing over the course of years, that precipitated the actual harm, comprising the ‘occasion giving rise to liability in this factual context.’ ” (Id. at 231 [citations omitted], citing Appalachian, 8 NY3d at 174.)
Contrary to the defendant’s claim in the instant matter, the incident to be examined under the unfortunate-event test is not the promulgation of the policy, which in and of itself does *266 not trigger coverage or cause personal injury. If the Sheriffs Department promulgated the policy, but failed to enforce it, there would be no personal injury. The policy itself merely created the potential for injury; the subsequent application resulted in actual injury, which must be demonstrated to impose liability in tort on the insured.
The court agrees with plaintiff that the case law establishes that the strip searches cannot be viewed as a single occurrence under the unfortunate-event test, specifically, the “close temporal and spatial relationship” requirement. The plaintiffs were searched on multiple dates, and each search involved the separate act by an agent of the defendant. They were not related to each other except for a remote or “common originating” cause of the defendant’s strip search policy. (Appalachian at 172 n 2.) Like the plaintiffs in International Flavors & Fragrances, Inc., the instant plaintiffs suffered similar injuries at the same location for the same reason. Defendant claims that these similarities support a single occurrence; however, the Court in International Flavors & Fragrances, Inc. noted that the immediate cause was each plaintiff’s separate exposure to harmful ingredients, and not the remote occurrence of the shipment of the flavoring itself, which only presented the potential for injury. (See also Stonewall Ins. Co. v Asbestos Claims Mgt. Corp., 73 F3d 1178, 1213 [2d Cir 1995] [“In determining the number of occurrences for deductible purposes, New York inquires whether multiple claims result from ‘an event of an unfortunate character that takes place without one’s foresight or expectation.’. . . (A)lthough a single ‘occurrence’ may give rise to multiple claims, courts should look to the event for which the insured is held liable, not some point further back in the causal chain” (emphasis and citations omitted)]; In re Prudential Lines Inc., 158 F3d 65, 81 [2d Cir 1998] [“all asbestos-related bodily claims against Prudential resulting from exposure to asbestos on a particular ship cannot be attributed to a single occurrence”].)
Finally, defendant argues that a single plaintiff deductible cannot be considered the reasonable expectation of an ordinary businessperson entering this insurance contract, and that if defendant has to pay the entire multimillion dollar claim, the insurance would not justify the premiums. However, the County also concedes that government entities are routine targets for class action suits of “dubious merit” whose allegations fall within the scope of the government entities’ police *267 professional liability policies. The court first notes that the instant claim was hardly of “dubious merit.” More importantly, “parties to an insurance policy, like the parties to any contract, are free to determine the terms of their arrangement. If they intend to allow grouping of claims, they need only include language expressing that intent.” (Appalachian Ins. Co. v General Elec. Co., 8 NY3d 162, 173 n 3 [2007]; International Flavors & Fragrances, Inc. v Royal Ins. Co. of Am., 46 AD3d 224, 228 [1st Dept 2007] [“(S)ophisticated parties to an insurance contract. . . are free to define ‘occurrence’ in such a manner as to provide for the aggregation of claims”].) The County is a sophisticated party to this type of insurance contract, and it concedes that it was aware of the potential for this exact type of class action suit. It should have used its freedom to contract to define the most important and potentially the most costly terms of the policies.
Accordingly, that branch of plaintiff’s motion seeking summary judgment as to the single claim deductible is granted. Attorney’s Fees Allocation
The insurance policies state that
“[t]he deductible amount stated in the Declarations, if any, applies to all damages because of bodily injury, property damages and personal injury sustained by one person or organization as the result of any one occurrence.
“ . . . The deductible amount stated in the Declarations applies to each occurrence and includes loss payments and adjustment, investigative and legal fees and costs, whether or not loss payment is involved.”
The defendant argues that all counsel fees should be allocated to the claim brought by the named claimant. Plaintiff has divided the total amount of counsel fees and costs incurred by the number of claimants and declares that an identical amount of fees and costs is attributable to each claimant. However, defendant notes that the policies do not address how counsel fees are to be allocated where those fees are incurred in a single action arising out of several occurrences. The policies are silent on the issue of allocation in such circumstances, and therefore, defendant argues that any ambiguity created by the contract should be construed against the insurance company. (Matter of Progressive Ins. Cos. [Nemitz], 39 AD3d 1121, 1122 [3d Dept 2007]; Travelers Indem. Co. v Commerce & Indus. Ins. Co. of Can., 36 AD3d 1121, 1122-1123 [3d Dept 2007].)
*268 Plaintiff concedes that the deductible condition does not state how to apportion legal fees and costs expended in defending against the entire action among individual claims. Plaintiff argues that defendant’s approach is contrary to the reality that legal fees and costs of approximately $314,551.30 incurred in defending the class action were incurred to defend the entire action, not an individual claim of $5,000. Plaintiff notes that whether defense costs are allocated equally among the claims or ratably, the loss payment plus defense costs attributable to each claim are below the amount of the per claim deductible. Plaintiff argues that “it would appear that generally, legal expenses and costs attributable to the defense of multiple claims should be allocated ratably according to the recovery obtained in each of those claims.”
“[I]t is well settled that resolution of the rights and liabilities of parties to an insurance contract is a question of law for a court to determine based upon the specific provisions of the policy at issue, unless the terms of the policy are ambiguous and require consideration of extrinsic evidence as an aid to construction. If, however, extrinsic evidence does not resolve the ambiguity, the interpretation of the ambiguous contract terms remains a question of law for the court. Courts have consistently construed ambiguous policy provisions in favor of coverage and against the insurer who drafted the policy. In order for the insurer to prevail, it must demonstrate not only that its interpretation is reasonable but that it is the only fair interpretation.” (Primavera v Rose & Kiernan, 248 AD2d 842, 843 [3d Dept 1998] [citations omitted].)
Silence on this issue in the policies creates ambiguity, which should be resolved against the drafting party. Employing a similar rationale as with the question of the deductibles, this court agrees with the County that if plaintiff wanted litigation expenses to be applied pro rata or ratably by recovery in a multi-claim action, it should have expressly said so in the subject policies. The court further agrees with defendant that plaintiff has failed to establish that it has set forth the only reasonable interpretation of the ambiguity. While the plaintiff reasonably argues that it would not have expended such a large sum to defend a single claim where the settlement was $5,000, that fact alone does not establish that litigation expenses should be allocated pro rata or ratably by recovery. *269 Defendant convincingly argues that the amount of litigation expenses was not a precise function of the size of the class, and notes that the Bruce action was settled before knowing the exact size of the class. A review of the legal invoices attached to plaintiff’s cross motion notes that only 11 claimants were actually deposed, and that counsel reviewed their records. The remainder of the costs include “legal research,” and research into defendant’s practices, which would remain static no matter how many claimants came forward.
As the policies create ambiguity on the issue of allocation, and the plaintiff’s interpretation is not the only fair resolution of the ambiguity, the provision shall be construed against the insurer, and all attorney’s fees and costs arising out of the Bruce action should be attributed to the claim of Mr. Bruce. Summary judgment is awarded to the defendant and plaintiff’s complaint is dismissed to the extent that it seeks any amount greater than $816,000, which constitutes the amount actually paid to the 806 claimants other than Mr. Bruce, plus a full $10,000 deductible attributable to Mr. Bruce’s claim.
Bad Faith
Defendant is opposing plaintiff’s motion for summary judgment based on allegations that Selective failed to oppose class certification. Defendant argues that Selective knew that if a class was certified, each class member would trigger a new $10,000 deductible for the County to absorb. Defendant reviews portions of the Nathaniel Bruce docket, and notes that the deadline for the plaintiffs to seek class certification was extended without opposition by Selective’s attorneys. Further, Selective’s attorneys did not oppose plaintiffs’ motion for leave to file an amended complaint and for permissive joinder of additional class representatives. Selective’s attorneys did not oppose the consolidation of the Bruce and Kahler actions, and there was no opposition to a permanent class certification on March 18, 2004. Nevertheless, the court denied the motion as untimely.
Defendant also refers to the affirmation of Elmer Robert Reach, III, Esq., lead counsel for the plaintiffs in the underlying class action suit, which was submitted in support of the motion for final approval of the class action settlement, and attached to Selective’s instant motion for summary judgment. In his affirmation, Mr. Reach stated that “while there is good case law supporting certification of strip search class actions, recovery in this action on a class wide basis was by no means assured.”
*270 Defendant argues that the above information raises questions of bad faith on plaintiffs part in that Selective failed to adequately oppose class certification. Defendant argues that there are factual questions concerning whether Selective placed its own interests above its insured, and that the court should deny the summary judgment motion. (See Commerce & Indus. Ins. Co. v North Shore Towers Mgt., 162 Misc 2d 778, 780 [Civ Ct, NY County 1994] [“The insurer’s unconditioned right to settle is, however, subject to a duty to settle in good faith”].)
Plaintiff notes that the only allegation of bad faith concerning the settlement is the simple fact that the entire settlement fell within the per claim deductible. Plaintiff submits the affirmation of Richard Galbo, Esq., principal of Galbo & Associates, attorneys for plaintiff. He states that on June 30, 2003, he wrote to advise the County that a separate deductible applied to each named plaintiff in the underlying class action, and that if the class was certified, a separate deductible would also apply to each unnamed plaintiff. He states that he discussed these issues with County Attorney Robert Smith, wherein the County agreed with Selective’s strategy of exploring settlement before having the District Court rule on the underlying claimants’ request for class certification. On December 15, 2003, Mr. Galbo met with the County Attorney and the Clerk of the County Legislature to discuss the status of the underlying action, the legal issues involved, and a potential settlement. At the conclusion of the meeting, Mr. Smith agreed with defense counsel’s recommendation that the action be settled for up to $1,000 per claimant plus attorney’s fees. On January 6, 2004, Mr. Galbo wrote to Mr. Smith confirming his agreement with defense counsel’s settlement strategy. Mr. Galbo states that the County never objected to the settlement strategy or the terms of the settlement, and approved the settlement although it knew of Selective’s position that the settlement fell within the police policy deductibles.
In reply, defendant submits the affirmation of Robert Smith, Esq., wherein he notes that Selective had represented to him that it had incurred the additional expense of retaining a national law firm in an effort to defeat class certification and to afford the best defense possible to the County. He states that this national law firm informed him that there were no defenses to the class certification being sought, and that it would be granted by the court, so opposition would be futile. Based on that advise, he did not oppose Selective’s counsel’s *271 strategy. Mr. Smith also refers to the affirmation made by Mr. Reach in the underlying action, which stated that “while there is good case law supporting certification of strip search class actions, recovery in this action on a class wide basis was by no means assured.” He states that the only entities that benefited from allowing the class certification were Selective and the plaintiffs’ attorney. He states, “had I not been advised by their ‘experts’ that class certification could not be defeated, I would never have consented to Selective’s strategy that included allowing certification even after the District Court had denied it as untimely.”
Plaintiff replies that the only evidence that the County provides that purports to indicate that class certification may have been denied is a statement by Mr. Reach in support of the final approval of the class action settlement. The County fails to provide any legal authority to support an argument that there was a strong possibility that class certification would have been denied. Plaintiff also contests Mr. Smith’s statement that the only entity that benefitted from allowing class certification was Selective. Selective argues that if the County’s lawyers lost class certification, the amount that the County would have owed under its deductibles could have been greater, which is why the County agreed to settle the suit prior to final class certification.
The Court of Appeals has held that a bad faith finding does not require a “heightened” showing of the insurer’s “sinister motive” or intent to cause harm to the insured. Rather, a showing must be made that the “insurer’s conduct constituted a gross disregard of the insured’s interests—that is, a deliberate or reckless failure to place on equal footing the interests of its insured with its own interests when considering a settlement offer.” (Pavia v State Farm Mut. Auto. Ins. Co., 82 NY2d 445, 453 [1993] [internal quotation marks and citations omitted].)
The court does not find any bad faith in Selective’s failure to oppose what amounts to scheduling (extending certain deadlines). Nor does the failure to oppose the filing of an amended complaint for permissive joinder of additional class representatives indicate that Selective would not oppose class certification. The court does not find any bad faith in Selective’s failure to oppose the consolidation of the Bruce and Kahler actions. Further, the permanent class certification on March 18, 2004 came after the settlement on March 11, 2004, and there is every indication that the County agreed that this would be *272 the best way to proceed. As for Mr. Smith’s assertions that he never would have agreed to settle if he thought class certification was defensible, the court has reviewed Mr. Reach’s affirmation in the federal action. After his statement that “while there is good case law supporting certification of strip search class actions, recovery in this action on a class wide basis was by no means assured,” he went on to detail five other class actions in the Second Circuit that had progressed to a decision on certification and/or class settlement. Two cases were pending, one settled, one was decertified by stipulation, and one included unusual circumstances wherein counsel discontinued the action without telling the certified class. Only one case was not certified based on the court’s concern for “manageability.” Mr. Reach goes on to explain that of the cases that were certified, class members still had to face individualized trials on damages; many class members had been in prison before, and would have a difficult time proving that they were emotionally damaged by a strip search. Further, class members with a history of drug and alcohol abuse would not be “endeared” to upstate juries. Mr. Reach therefore opined that the settlement amount of $1,000 per claimant was reasonable. The court does not find any support in Mr. Reach’s affirmation that there was any likelihood that the underlying plaintiffs would not obtain class status, and the County has failed to provide any such authority.
Further, the court also notes that if the class was not certified, it is possible that each individual could have sued, which would have triggered a separate deductible, leaving the County in the exact same, if not worse (if any of the litigants won a large award after trial), position that it is in now.
Accordingly, it is hereby ordered that plaintiff’s motion for summary judgment is granted to the extent that the County owes Selective a separate deductible for each underlying class action plaintiff, and it is further ordered that defendant is granted summary judgment on the issue of counsel fees, specifically, that all counsel fees should be allocated to the claim brought by the named claimant; plaintiff’s complaint is dismissed to the extent that it seeks any amount greater than $816,000, which constitutes the amount actually paid to the 806 claimants other than Mr. Bruce, plus a full $10,000 deductible attributable to Mr. Bruce’s claim.