[991 NE2d 666, 969 NYS2d 808]

ROMAN CATHOLIC DIOCESE OF BROOKLYN et al., Appellants, v NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Respondent, et al., Defendant.

Argued March 19, 2013; decided May 7, 2013

140

## POINTS OF COUNSEL

*Herzfeld & Rubin, P.C.*, New York City (*David B. Hamm* and *Miriam Skolnik* of counsel), for appellants. I. National Union Fire Insurance Company of Pittsburgh, Pa.'s failure to raise either "multiple occurrences" (hence, multiple self-insured retentions) or pro rata allocation as grounds for partial denial of coverage in its 2004 disclaimer letters precludes their reliance upon those grounds now. (*General Acc. Ins. Group v Cirucci*, 46 NY2d 862; *Adames v Nationwide Mut. Fire Ins. Co.*, 55 AD3d 513; *Shell v Fireman's Fund Ins. Co.*, 17 AD3d 444; *Clayburn v Nationwide Mut. Fire Ins. Co.*, 58 AD3d 990; *Fair Price Med. Supply Corp. v Travelers Indem. Co.*, 10 NY3d 556; *Central Gen. Hosp. v Chubb Group of Ins. Cos.*, 90 NY2d 195; *County of Sullivan v State of New York*, 137 AD2d 165; *First Fin. Ins. Co. v Jetco Contr. Corp.*, 1 NY3d 64; *Allstate Ins. Co. v Gross*, 27 NY2d 263; *Matter of Worcester Ins. Co. v Bettenhauser*, 95 NY2d 185.) II. There was here but one "occurrence," i.e., one "continuous or repeated exposure to substantially the same general harmful conditions." Only one "per occurrence" self-insured retention was required to be paid. (*Appalachian Ins. Co. v General Elec. Co.*, 8 NY3d 162; *Caporino v Travelers Ins. Co.*, 62 NY2d 234; *Government Empls. Ins. Co. v Kligler*, 42 NY2d 863; *Graphic Arts Mut. Ins. Co. v Bakers Mut. Ins. Co. of N.Y.*, 45 NY2d 551; *Insurance Co. of N. Am. v Dayton Tool & Die Works*, 57 NY2d 489; *Commissioners of State Ins. Fund v Insurance Co. of N. Am.*, 80 NY2d 992; *State Farm Mut. Auto. Ins. Co. v Langan*, 16 NY3d 349; *Miller v Continental Ins. Co.*, 40 NY2d 675; *Pioneer Tower Owners Assn. v State Farm Fire &*

*Cas. Co.*, 12 NY3d 302; *Matter of Mostow v State Farm Ins. Cos.*, 88 NY2d 321.) III. Pro rata allocation should not be applied under the circumstances of this case. (*Consolidated Edison Co. of N.Y. v Allstate Ins. Co.*, 98 NY2d 208; *Olin Corp. v Insurance Co. of N. Am.*, 221 F3d 307; *Belt Painting Corp. v TIG Ins. Co.*, 100 NY2d 377; *Continental Cas. Co. v Rapid-American Corp.*, 80 NY2d 640; *Century Indem. Co. v Brooklyn Union Gas Co.*, 58 AD3d 573; *In re Prudential Lines Inc.*, 158 F3d 65; *Serio v Public Serv. Mut. Ins. Co.*, 304 AD2d 167; *State of N.Y. Ins. Dept., Liquidation Bur. v Generali Ins. Co.*, 44 AD3d 469.)

*Edwards Wildman Palmer LLP*, New York City (*Barbara I. Michaelides, John D. Hughes* and *Robert W. DiUbaldo* of counsel), for respondent. I. National Union Fire Insurance Company of Pittsburgh, Pa. did not waive its right to assert that plaintiffs are required to exhaust a separate $250,000 self-insured retention for each triggered policy from which coverage is sought, in the event that coverage for the underlying action is ultimately found to exist. (*Zappone v Home Ins. Co.*, 55 NY2d 131; *Pav-Lak Indus., Inc. v Arch Ins. Co.*, 56 AD3d 287; *Power Auth. of State of N.Y. v National Union Fire Ins. Co. of Pittsburgh*, 306 AD2d 139; *Matter of Worcester Ins. Co. v Bettenhauser*, 95 NY2d 185; *Perkins v Allstate Ins. Co.*, 51 AD3d 647; *Solomon v United States Fid. & Guar. Co.*, 43 AD3d 333; *Fulton Boiler Works, Inc. v American Motorists Ins. Co.*, 828 F Supp 2d 481; *Westchester Fire Ins. Co. v MCI Communications Corp.*, 74 AD3d 551; *Fair Price Med. Supply Corp. v Travelers Indem. Co.*, 10 NY3d 556; *Hospital for Joint Diseases v Travelers Prop. Cas. Ins. Co.*, 9 NY3d 312.) II. The Appellate Division's ruling on the number of occurrences should be affirmed. (*Appalachian Ins. Co. v General Elec. Co.*, 8 NY3d 162; *ExxonMobil Corp. v Certain Underwriters at Lloyd's, London*, 50 AD3d 434; *International Flavors & Fragrances, Inc. v Royal Ins. Co. of Am.*, 46 AD3d 224; *H.E. Butt Grocery Co. v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F3d 526; *United States Fid. & Guar. Co. v Annunziata*, 67 NY2d 229; *Interstate Fire & Cas. Co. v Archdiocese of Portland in Or.*, 35 F3d 1325; *Fulton Boiler Works, Inc. v American Motorists Ins. Co.*, 828 F Supp 2d 481; *Olin Corp. v Insurance Co. of N. Am.*, 221 F3d 307; *Diocese of Winona v Interstate Fire & Cas. Co.*, 916 F Supp 923, 89 F3d 1386; *Ranger Ins. Co. v Safety-Kleen Corp.*, 814 F Supp 744.) III. The Appellate Division correctly applied the *Consolidated Edison* pro rata allocation methodology. (*Consolidated Edison Co. of N.Y. v Allstate Ins. Co.*, 98 NY2d 208; *Serio v Public Serv. Mut. Ins. Co.*, 304 AD2d 167; *Fulton Boiler Works, Inc. v American Motorists*

*Ins. Co.*, 828 F Supp 2d 481; *Crucible Materials Corp. v Certain Underwriters at Lloyd's London & London Mkt. Cos.*, 681 F Supp 2d 216; *Olin Corp. v Insurance Co. of N. Am.*, 221 F3d 307; *Century Indem. Co. v Brooklyn Union Gas Co.*, 58 AD3d 573; *In re Prudential Lines Inc.*, 158 F3d 65; *State of N.Y. Ins. Dept., Liquidation Bur. v Generali Ins. Co.*, 44 AD3d 469; *Westchester Fire Ins. Co. v MCI Communications Corp.*, 74 AD3d 551; *Bingham v New York City Tr. Auth.*, 99 NY2d 355.)

**OPINION OF THE COURT**

RIVERA, J.

 This insurance coverage dispute involves the apportionment of liability for a settlement between the Roman Catholic Diocese of Brooklyn (the Diocese), and a minor plaintiff in an underlying civil action charging sexual molestation by a priest. We agree with the Appellate Division that the incidents of sexual abuse constituted multiple occurrences, and that any potential liability should be apportioned among the several insurance policies, pro rata. We therefore affirm.

In November 2003, Jeanne M. N.-L., individually and as mother and natural guardian of Alexandra L., a minor under the age of 18 years, commenced a civil action against the Diocese and one of its priests. The complaint, as amplified by the bill of particulars, alleged that the priest sexually abused Alexandra on several occasions from August 10, 1996 through May 2002, and that the molestation took place in several locations including the rectory, office and other areas of a church in Queens, New York; the priest's vehicle; the plaintiff's home; and a home in Amityville, New York.

In August 2007, the Diocese settled the action for $2 million and "additional consideration." The appeal before us involves a dispute between the Diocese and defendant National Union Insurance Company of Pittsburgh, Pa. (National Union), one of its insurance carriers, regarding the Diocese's demand for reimbursement for the settlement.

National Union provided primary insurance to the Diocese, and issued three consecutive one-year commercial general liability policies for August 31, 1995 to August 31, 1996; August 31, 1996 to August 31, 1997; and August 31, 1997 to August 31, 1998. Nonparty Illinois National Insurance Company provided primary coverage for the next three years from August 31, 1998 to August 31, 2001. Defendant Westchester Fire Insurance Company, who settled with the Diocese and is not a party on

this appeal, provided excess umbrella coverage for all seven years under consecutive annual policies. The National Union policies provide coverage for damages resulting in bodily injury during the policy period, and include a liability limitation of $750,000 and a $250,000 self-insured retention (SIR) applicable to each occurrence.[1] The parties, thus, agreed that for each occurrence resulting in bodily injury within the policy period, National Union would be liable for covered damages after the first $250,000 (in excess of the SIR), and its liability would cap at $750,000.

When the Diocese sought coverage under the 1996-1997 and 1997-1998 National Union policies, National Union responded by letter dated July 15, 2004, disclaiming coverage based on, inter alia, two exclusionary provisions referring to sexual abuse,[2] and also asserted that the "policies have $750,000 policy limits

---

1. The initial "Self Insured Retention" endorsement proposed that each SIR "shall apply separately to each claim arising out of such 'occurrence.'" However, at the request of the Diocese that the purchased coverage "was per occurrence which includes all losses arising out of that occurrence," the language was amended in a revised endorsement to reflect that each SIR "shall apply separately to each occurrence." There is no dispute between the parties that the $250,000 SIR and $750,000 liability limit applies "per occurrence."

2. The 1996-1997 policy's endorsement regarding "Sexual Abuse, Sexual Molestation, [or] Sexual Assault" states:

> "Not withstanding [sic] anything in the policy terms or conditions to the contrary, it is hereby understood and agreed that this contract will NOT cover any school, day care center, child care center or any other related facility for any claims resulting from any claims arising out of: sexual abuse, sexual molestation, sexual assault, sexual victimization, or mental injury or emotional injury resulting therefrom or from any coercing to engage in sexual activities on the part of any employee, assistant, or volunteer of any such facility owned by, operated by or maintained by any insured."

The 1997-1998 policy's endorsement regarding a "Sexual Abuse or Molestation Exclusion" provides:

> "This insurance does not apply to 'bodily injury', 'property damage', 'advertising injury' or 'personal injury' arising out of:
> "(a) the actual or threatened sexual abuse or molestation by anyone of any person anywhere, or
> "(b) the negligent:
> "(i) employment;
> "(ii) investigation;
> "(iii) supervision;
> "(iv) reporting to the proper authorities or failure to so report; or
> "(v) retention;
> "of any person whose conduct would be excluded by (a) above."

over a $250,000 self-insured retention," and coverage is applicable only if the "bodily injury" occurred during the policy period. In response to a subsequent request for coverage under the 1995-1996 policy, National Union again disclaimed coverage in a December 1, 2004 letter, based on the previously cited exclusionary provisions.[3]

In January 2009, the Diocese sought a declaratory judgment that National Union was required to indemnify the Diocese for the $2 million settlement and certain defense fees and costs, up to the liability limits of the 1995-1996 and 1996-1997 policies. National Union asserted two affirmative defenses relevant to this appeal. First, it claimed that "to the extent coverage exists for plaintiffs' claim, it is subject to multiple self-insured retentions under the Policies." Second, it asserted that "coverage obligation is limited by the availability of other 'valid and collectible' insurance for which plaintiffs may be entitled to coverage."

National Union moved for partial summary judgment, seeking an order that the incidents of sexual abuse in the underlying action constituted a separate occurrence in each of the seven implicated policy periods, and required the exhaustion of a separate $250,000 SIR for each occurrence covered under a policy from which the Diocese sought coverage. National Union also sought a ruling requiring that the $2 million settlement be paid on a pro rata basis across each of the seven policies. In opposition, the Diocese argued that the sexual abuse constituted a single occurrence requiring the exhaustion of only one SIR, and that allocation of liability should be pursuant to a joint and several allocation method, under which the entire settlement amount could be paid for with National Union's 1995-1996 and 1996-1997 policies. The Diocese also cross-moved for partial summary judgment, seeking a declaration that National Union waived the two affirmative defenses by failing to timely include those bases in their notices of disclaimer of coverage.

Supreme Court denied National Union's motion for partial summary judgment and granted the cross motion of the Diocese, concluding that National Union, in contravention of the requirements of Insurance Law § 3420 (d), failed to timely disclaim coverage. The court further determined that the incidents of sexual abuse constituted a single occurrence, but

---

**3.** The merits of National Union's coverage defenses are still being litigated in Supreme Court and are not relevant to this appeal.

observed that the language of the policies required the exhaustion of the SIR for each implicated policy.

The Appellate Division reversed the order of Supreme Court, declaring that the alleged acts of sexual abuse constituted multiple occurrences, and that the settlement amount should be allocated on a pro rata basis over the seven policy periods, requiring the concomitant satisfaction of the SIR attendant to each implicated policy (87 AD3d 1057 [2011]). The court granted the Diocese leave to appeal (2012 NY Slip Op 64632[U] [2012]), and certified the following question to this Court: "Was the decision and order of this court dated September 20, 2011, properly made?"

I

As a threshold matter, the Diocese contends that, by failing to timely disclose certain grounds for disclaimer in violation of Insurance Law § 3420 (d), National Union waived the right to assert those contentions in defense: specifically, that exhaustion of the SIR is required for each implicated policy; the incidents of sexual abuse constituted multiple occurrences; and that pro rata allocation is appropriate in this case. Although the Diocese correctly points out that failure to comply with section 3420 (d) notice requirements bars an insurer from seeking to disclaim coverage, National Union was under no statutory duty to disclose a liability limitation, and therefore is not barred from making its arguments regarding the application of the SIR, and allocation.

In the event an insurer seeks to disclaim coverage, section 3420 (d) (2) imposes a timeliness requirement on the issuance of a written notice of disclaimer. It provides:

> "If under a liability policy issued or delivered in this state, an insurer shall disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring within this state, it shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured and the injured person or any other claimant."

Failure to raise a ground for disclaimer "as soon as is reasonably possible" precludes an insurer from later asserting it as a defense (*see General Acc. Ins. Group v Cirucci*, 46 NY2d 862,

863 [1979]; *Hospital for Joint Diseases v Travelers Prop. Cas. Ins. Co.*, 9 NY3d 312, 319 [2007] ["(T)he failure by Travelers to seek verification of the assignment in a timely manner prevents the carrier from litigating the issue now"]; *Fair Price Med. Supply Corp. v Travelers Indem. Co.*, 10 NY3d 556, 563 [2008]).

In *Zappone v Home Ins. Co.* (55 NY2d 131 [1982]), we previously recognized a narrow exception to the timeliness requirement of section 3420 (d), holding that a notice of disclaimer is not required in the event there "is no insurance at all and, therefore, no obligation to disclaim or deny" (55 NY3d at 139). This Court concluded that the notice requirement only applied to "situations in which a policy of insurance that would otherwise cover the particular accident is claimed not to cover it *because of an exclusion in the policy*" (*id.* at 138 [emphasis added]).

Here, the defenses at issue do not relate to an argument of exclusion or disclaimer, but rather, focus on the extent of alleged liability under the various policies. Put simply, they are not subject to the notice requirements of section 3420 (d) because they "do[ ] not bar coverage or implicate policy exclusions" (*Pav-Lak Indus., Inc. v Arch Ins. Co.*, 56 AD3d 287, 288 [1st Dept 2008]). Thus, National Union did not have to give notice of the SIR requirement because the SIR is not a basis for disclaimer or denial of coverage (*see Power Auth. of State of N.Y. v National Union Fire Ins. Co. of Pittsburgh*, 306 AD2d 139, 140 [1st Dept 2003] ["Thus, the time requirements for disclaiming coverage under Insurance Law § 3420 (d) are inapplicable; since the retention amount does not implicate exclusions in the policy"]). The SIR, which is effectively a deductible to the policies, is not a basis for the denial of coverage. Similarly, arguments pertaining to the appropriate methodology for allocating liability do not provide an exclusionary basis to evade coverage. Accordingly, section 3420 (d) does not apply, and National Union is not precluded from arguing that the incidents of sexual abuse amounted to multiple occurrences, and that any liability should be apportioned on a pro rata basis.

## II

Turning to the merits, we now decide whether the several acts of sexual abuse constitute multiple occurrences. This is the first time we address the meaning of "occurrence" in the context of claims based on numerous incidents of sexual abuse of a minor by a priest, which spanned several years and several

policy periods. However, our prior consideration of the complexities associated with interpreting this term provide a roadmap for resolving the issues presented in this case.

It is well established that "[i]n determining a dispute over insurance coverage, we first look to the language of the policy" (*Consolidated Edison Co. of N.Y. v Allstate Ins. Co.*, 98 NY2d 208, 221 [2002], citing *Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 354 [1978]). In doing so, we must "construe the policy in a way that 'affords a fair meaning to all of the language employed by the parties in the contract and leaves no provision without force and effect'" (*Consolidated Edison*, 98 NY2d at 221-222, quoting *Hooper Assoc. v AGS Computers*, 74 NY2d 487, 493 [1989]).

The National Union policies at issue on this appeal define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." They define "bodily injury" to mean "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time," and limit liability to bodily injury that "occurs during the policy period."

Generally, the issue of what constitutes an occurrence has been a legal question for courts to resolve (*see Hartford Acc. & Indem. Co. v Wesolowski*, 33 NY2d 169 [1973]). In *Arthur A. Johnson Corp. v Indemnity Ins. Co. of N. Am.* (7 NY2d 222, 227 [1959]) this Court addressed how to determine whether "there [are] one or more [occurrences] within the meaning of [an insurance] clause limiting coverage to a certain amount per [occurrence]." We adopted the "unfortunate event" test, specifically rejecting other approaches that would equate the number of occurrences with either "the sole proximate cause" (*id.* at 227-228) or by the "number of persons damaged" (*id.* at 228).

In *Appalachian Ins. Co. v General Elec. Co.* (8 NY3d 162 [2007]) we stated that absent policy language indicating an intent to aggregate separate incidents into a single occurrence, the unfortunate event test should be applied to determine how occurrences are categorized for insurance coverage purposes (*see Appalachian*, 8 NY3d at 173). We determined that the unfortunate event test requires consideration of "whether there is a close temporal and spatial relationship between the incidents giving rise to injury or loss, and whether the incidents can be viewed as part of the same causal continuum, without intervening agents or factors" (*id.* at 171-172). This Court has

further observed that "[t]his approach of determining simply whether there was one unfortunate event or occurrence seems to us to be the most practical of the three methods of construction which have been advanced because it corresponds most with what the average person anticipates when he [or she] buys insurance and reads the [occurrence] limitation in the policy" (*Johnson*, 7 NY2d at 229-230 [internal quotation marks omitted]).

Here, nothing in the language of the policies, nor the definition of "occurrence," evinces an intent to aggregate the incidents of sexual abuse into a single occurrence (*cf. Consolidated Edison*, 98 NY2d at 222 [a policy expressly providing that "(a)ll such exposure to or events resulting from substantially the same general conditions during the policy period *shall be deemed one occurrence*" (emphasis added)]). Applying the unfortunate event test we conclude that the incidents of sexual abuse within the underlying action constituted multiple occurrences. Clearly, incidents of sexual abuse that spanned a six-year period and transpired in multiple locations lack the requisite temporal and spatial closeness to join the incidents (*see Johnson*, 7 NY2d at 230 ["(W)e conclude that the collapses of separate walls, of separate buildings at separate times, were in fact separate disastrous events, and, thus, two different accidents within the meaning of the policy"]). While the incidents share an identity of actors, it cannot be said that an instance of sexual abuse that took place in the rectory of the church in 1996 shares the same temporal and spatial characteristics as one that occurred in 2002 in, for example, the priest's automobile (*see Appalachian*, 8 NY3d at 174 ["On this record, it appears that the incidents share few, if any, commonalities, differing in terms of when and where exposure occurred"]).

Moreover, the incidents are not part of a singular causal continuum. The causal continuum factor is best illustrated by the facts of *Wesolowski* (33 NY2d 169 [1973]). In that case, this Court held that a three-car collision amounted to a single occurrence "[w]here the insured's automobile struck one oncoming vehicle, ricocheted off and struck a second more than 100 feet away" (33 NY2d at 170). Under those facts, "the two collisions here occurred but an *instant apart*" and "[t]he continuum between the two impacts was *unbroken, with no intervening agent or operative factor*" (*id.* at 174 [emphasis added]). Thus, contrary to the Diocese's and dissent's view that the negligent

supervision was the sole causal factor, and thus requires a finding of a single occurrence, the unfortunate event test requires us to focus on "the nature of the incident[s] giving rise to damages" (*Appalachian*, 8 NY3d at 171; *see also H.E. Butt Grocery Co. v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F3d 526, 531 [5th Cir 1998]; *Interstate Fire & Cas. Co. v Archdiocese of Portland in Or.*, 35 F3d 1325, 1329-1330 [9th Cir 1994]). As we stated in *Appalachian*, "cause should not be conflated with the incident" (8 NY3d at 172). Accordingly, where, as here, each incident involved a distinct act of sexual abuse perpetrated in unique locations and interspersed over an extended period of time, it cannot be said, like the uninterrupted, instantaneous collisions in *Wesolowski*, that these incidents were precipitated by a single causal continuum and should be grouped into one occurrence.[4]

The Diocese argues that the policies define occurrence as including "continuous or repeated exposure to substantially the same general harmful conditions." Therefore, the definition encompasses and anticipates multiple claims, losses and incidents within the meaning of a single occurrence. We agree that the term "occurrence" as defined in the policies may include situations involving multiple events. Our analysis does not end with that conclusion for it fails to resolve the crucial issue in this case, which is what types of claims, issues or incidents may be associated with a single occurrence for purposes of the per occurrence liability limitation and the SIR.

Previously, in *Continental Cas. Co. v Rapid-American Corp.* (80 NY2d 640, 648 [1993]), we observed that the insurance industry had shifted from accident-based coverage "to

---

4. The dissent's focus on the underlying claims of negligence asserted in the civil action against the Diocese—negligent hiring, supervision and retention—is akin to a sole proximate cause approach previously rejected by this Court (*see Johnson*, 7 NY2d at 227-228 [rejecting the "proximate cause, or *causa causans*" test]; *ExxonMobil Corp. v Certain Underwriters at Lloyd's, London*, 15 Misc 3d 1144[A], 2007 NY Slip Op 51138[U], *10 [2007] ["New York's highest court rejected the 'cause' test that ExxonMobil appears to argue, in favor of the 'unfortunate event' test"]). The unfortunate event test does not prohibit consideration of common causation, but places it among a number of factors to be evaluated. The "fulcrum of our analysis" is the pertinent incident (*Appalachian*, 8 NY3d at 172). Therefore, the dissent's focus on the cause, rather than the circumstances of the sexual molestation misses the mark. We also note that we are analyzing the language of the insurance policy, and not the victim's personal injury action. The fact that the victim may posit a theory of negligence does not determine the meaning of the language of the insurance policies nor the parties' intent.

occurrence-based coverage in 1966 to make clear that gradually occurring losses would be covered so long as they were not intentional." Consequently, a number of our occurrence-based insurance coverage cases have dealt with injuries caused by exposure to environmental, or other external, hazards (*see id.*; *Appalachian*, 8 NY3d 162 [2007]; *Consolidated Edison*, 98 NY2d 208 [2002]). Certainly, in those cases, the injuries at issue comported with the general meaning of an "occurrence" as "continuous or repeated exposure to conditions" (*Continental Cas. Co.*, 80 NY2d at 648).

In our view, sexual abuse does not fit neatly into the policies' definition of "continuous or repeated exposure" to "conditions." This "sounds like language designed to deal with asbestos fibers in the air, or lead-based paint on the walls, rather than with priests and choirboys. A priest is not a 'condition' but a sentient being" (*Lee v Interstate Fire & Cas. Co.*, 86 F3d 101, 104 [7th Cir 1996]; *see also Champion Intl. Corp. v Continental Cas. Co.*, 546 F2d 502, 507-508 [2d Cir 1976, Newman, J., dissenting] [noting that an "exposure to conditions" involves physical exposure to "phenomenon such as heat, moisture, or radiation"]; *ExxonMobil*, 15 Misc 3d 1144[A], 2007 NY Slip Op 51138[U], *9 ["the purpose of a continuous exposure clause is to combine claims that occur 'when people or property are physically exposed to some injurious phenomenon such as heat, moisture, or radiation' "]). The settlement in the underlying claim addresses harms for acts by a person employed by the Diocese. The Diocese's argument that the parties intended to treat numerous, discrete sexual assaults as an accident constituting a single occurrence involving "conditions" is simply untenable.

Although our focus is the language of the policies and the parties' intent, the Diocese characterizes the victim's experience as a "pattern" in support of its argument that this is a single occurrence. While the nature of the incidents that caused injuries is relevant to our assessment under the unfortunate event test, it is not readily apparent how the victim's own perceptions of sexual molestation shed light on the parties' intent and the meaning of the terms in the policies. However, it is certainly at least as tenable to conclude that from the victim's perspective each event is marked by its own serious, individualized set of facts with particularized harms, further supporting a multiple occurrence interpretation of the molestation.

The Diocese analogizes this case to *State Farm Fire & Cas. Co. v Elizabeth N.* (9 Cal App 4th 1232, 12 Cal Rptr 2d 327

[1992]) where two children attending a day care center "had been sexually molested over a period of a month or more" (9 Cal App 4th at 1235, 12 Cal Rptr 2d at 328). There, the Court of Appeal for the First District, Division 3, of California held that the multiple instances of sexual molestation constituted a single occurrence for insurance coverage purposes. We decline, however, to follow that holding because of certain materially distinguishable differences. First, unlike the plain language at issue here, the policy in *Elizabeth N.* expressly provided that "[a]ll bodily injury and property damage resulting from any one accident or from continuous or repeated exposure to substantially the same general conditions *shall be considered to be the result of one occurrence*" (9 Cal App 4th at 1236, 12 Cal Rptr 2d at 329 [emphasis added]). Again, there is no language within National Union's policies indicating an intent to aggregate the sexual abuse into a single occurrence. Second, and more significantly, the parties in *Elizabeth N.* "agree[d] that the number of occurrences depends on the cause of injury rather than the number of injurious effects" (9 Cal App 4th at 1236-1237, 12 Cal Rptr 2d at 329). The California Court of Appeal reasoned that the negligent failure of the day care owner to adequately care for, and supervise the children, subjected them to repeated molestation by the perpetrator (*see* 9 Cal App 4th at 1238, 12 Cal Rptr 2d at 330). We, on the other hand, have typically applied the unfortunate event test, an inquiry primarily focused on "the nature of the incident[s] giving rise to damages" (*Appalachian*, 8 NY3d at 171). Thus, unlike this appeal, a finding of a single occurrence was warranted in *Elizabeth N.* under the analytical framework employed by the California court and the particular definition of "occurrence" in the policy at issue.[5]

---

**5.** By contrast, in *H.E. Butt Grocery Co.* (150 F3d 526 [1998]), a case involving the sexual abuse of two children in a grocery store, the United States Court of Appeals for the Fifth Circuit rejected an argument that the underlying negligent supervision of the perpetrator warranted a finding of a single occurrence. That court remarked that "when the underlying basis for liability is negligent supervision, yet the damage is caused by an intervening intentional tort, the court cannot look past the immediate cause of the damage for purposes of the insurance policy. Thus, the two independent acts of sexual abuse 'caused' the two children's injuries" (150 F3d at 531). In *Archdiocese of Portland* (35 F3d 1325 [1994]), a factually similar case involving numerous incidents of molestation of a minor by a priest, the United States Court of Appeals for the Ninth Circuit construed the "per occurrence"

*(n. cont'd)*

Consequently, the Diocese must exhaust the SIR for each occurrence that transpires within an implicated policy from which it seeks coverage (*see Olin Corp. v Insurance Co. of N. Am.*, 221 F3d 307, 328 [2d Cir 2000] ["when multiple policies are triggered and liability is allocated to each, each policy's deductible is applicable"]). The policies provide that the SIR "shall apply separately to each occurrence," and only to "occurrences covered under [the] policy." The only occurrences that are subject to the policies are those with damages resulting from bodily injuries that occur within the policy period. Therefore, for each policy from which coverage is sought, the SIR is inextricably linked to an occurrence which results in bodily injury during the policy period, and the attendant deductible must be satisfied before coverage can be triggered.[6] The consequences of such policy language is that the SIR applies to an occurrence with bodily injuries within the policy period, not to an occurrence with injuries sustained in a subsequent policy year. Despite the dissent's view, if the parties had agreed to a $250,000 SIR in the first year of coverage, we would not assume that that SIR would apply to bodily injuries occurring in a subsequent, separate policy year.

To permit the Diocese to exhaust a single SIR and then receive coverage from up to seven different policies would conflict with the plain language of the policies, and produce an outcome not intended by the parties. We reject this attempt by this insured to escape the consequences of its bargained for insurance policy provisions.

### III

Finally, with respect to allocation of liability, in *Consolidated Edison* (98 NY2d 208 [2002]), we highlighted the distinction between the joint and several allocation and pro rata allocation

---

policy to hold that the incidents constituted multiple occurrences, observing "that the occurrence is not the Archdiocese's negligent supervision of . . . or failure to remove [the priest], but rather, the exposure of the boy to the negligently supervised priest" (35 F3d at 1330 [internal quotation marks and emphasis omitted]).

6. The dissent argues that our interpretation of the policies—that each incidence of abuse constitutes a single occurrence exposing the Diocese to multiple SIRs per policy period—could not have been intended by the parties. However, the language of the policies is clear that the SIR applies separately to each occurrence, thus anticipating the possibility of multiple occurrences per policy period. Moreover, each occurrence carries a $250,000 SIR and $750,000 liability cap, regardless of the nature of the occurrence or claim that exposes the Diocese to liability.

methods. A joint and several allocation permits the insured to "collect its total liability . . . under any policy in effect during" the periods that the damage occurred (98 NY2d at 222), whereas a pro rata allocation "limits an insurer's liability to all sums incurred by the insured during the policy period" (*id.* at 222-223 [internal quotation marks omitted]).

In that case, Consolidated Edison had operated a gas plant for 60 years which had caused severe environmental contamination. Consolidated Edison sought a declaratory judgment that it could allocate all liability to any one of the 24 insurers who issued policies during the 60-year period in which the gas plant was operated. This Court agreed with the insurers that pro rata allocation, while not mandated by the policies, was consistent with the language of the policies and the circumstances of that case. The extent of environmental damage could not be precisely identified with any particular year of the 60-year period; therefore, we concluded that pro rata allocation was the appropriate method of apportioning liability among all the insurers. The Court observed that joint and several allocation is particularly inappropriate where "it is impossible to determine the extent of the . . . damage that is the result of an occurrence in a particular policy period" because it "presupposes [an] ability to pin an accident to a particular policy period" (*id.* at 224).

██ A pro rata allocation is consistent with the language of the policies at issue here. By example, National Union's 1995-1996 policy provides coverage for bodily injury only if the bodily injury "occurs during the policy period" and is caused by an "occurrence." Plainly, the policy's coverage is limited only to injury that occurs within the finite one-year coverage period of the policy. To that end, assuming that the minor plaintiff suffered "bodily injury" in each policy year, it would be consistent to allocate liability across all implicated policies, rather than holding a single insurer liable for harm suffered in years covered by other successive policies. There is no indication that the parties intended that the Diocese's total liability for bodily injuries sustained from 1996 to 2002 would be assumed by a single insurer. Furthermore, like *Consolidated Edison*, a joint and several allocation is not applicable in this case as the Diocese cannot precisely identify the sexual abuse incidents to particular policy periods. The minor plaintiff in the underlying action could only give a broad time-frame in which the sexual abuse was perpetrated and conceded in her affidavit that she was "unable in good faith . . . to state the exact date(s), time(s), [and]

place(s) of each and every assault" (*see Serio v Public Serv. Mut. Ins. Co.*, 304 AD2d 167 [2d Dept 2003]; *State of N.Y. Ins. Dept., Liquidation Bur. v Generali Ins. Co.*, 44 AD3d 469 [1st Dept 2007]). Thus, "[p]roration of liability among the insurers acknowledges the fact that there is uncertainty as to what actually transpired during any particular policy period" (*Consolidated Edison*, 98 NY2d at 224).

Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

SMITH, J. (concurring). I concur in the result, and join section III of the plurality opinion. I think, generally for the reasons explained in Judge Graffeo's opinion, that there was only one occurrence here, not several. But because that occurrence took place continuously over several years, the resulting injury must be allocated on a pro rata basis to each of the years, and one retention applied to each year's injury.

I am not sure why the plurality reaches the allocation issue. On the plurality's multiple-occurrence hypothesis, there is no possible allocation that can help plaintiff in this case. If each act of abuse was a separate occurrence, "allocation" is a factual question: how much injury is attributable to each act? I see no possible argument for allocating all the loss to one year, as plaintiff asks, if there were as many occurrences as there were acts of abuse.

On the other hand, on the hypothesis, which I believe correct, that there was a single occurrence extending over a multi-year period, allocation of the loss resulting from the occurrence presents a question of law—one that the plurality decides correctly. Under our decision in *Consolidated Edison Co. of N.Y. v Allstate Ins. Co.* (98 NY2d 208, 221-225 [2002]), when injury from a single covered accident or occurrence is incurred over a period to which several policies are successively applicable, each policy can be charged only with the portion of the injury that was suffered while that policy was in force. The retention in each policy should be applied against the injury allocated to it.

This reasoning leads to the same result reached in two federal cases involving coverage of claims for alleged sexual abuse by priests, *Interstate Fire & Cas. Co. v Archdiocese of Portland in Or.* (35 F3d 1325 [9th Cir 1994]) and *Society of R.C. Church of Diocese of Lafayette & Lake Charles, Inc. v Interstate Fire & Cas. Co.* (26 F3d 1359, 1361-1367 [5th Cir 1994]). Both the

plurality and Judge Graffeo, I believe, err in their discussions of the *Archdiocese of Portland* case. The plurality mistakenly thinks that case supports a multiple-occurrence theory here (plurality op at 152-153 n 5). Judge Graffeo correctly says that it supports a single-occurrence theory, but argues that it is distinguishable from the present case on the allocation issue (concurring and dissenting op at 162-163).

I see no critical distinction. I admit there is a difference: in *Archdiocese of Portland*, as in *Society of R.C. Church*, the court read the policy language to mean that a priest's acts of abuse, though constituting only one "occurrence" in any year, became a new "occurrence" when a new policy year began. I read the *Consolidated Edison* case to imply, and I would hold here, that under the policies now before us a new retention applies to the "injury" suffered each year. But the difference between "occurrence" and "injury" is inconsequential because, in sexual abuse cases, the abuse and the resulting injury are simultaneous. Thus whether it is the "occurrence" or the "injury" that is spread pro rata among policies will not alter the result in any case involving multi-year sexual abuse.

Judge Graffeo argues that, because the retentions in our case are identified as "per occurrence" retentions, only one retention can be credited against a multi-year occurrence, even though the injury is allocated pro rata over several years. But the better reading of the policies is that, even when an occurrence continues from year to year, a new retention becomes available each year. This would be obvious if different insurers issued identical policies in successive years; it would be wrong to let one insurer and not the others get the benefit of a retention. The happenstance that successive policies are issued by a single insurer should not change the outcome.

Though I reach the same result as the plurality here, my difference with both the plurality and Judge Graffeo would be significant in other cases. To clarify the point, imagine a case where a priest committed 20 acts of abuse of one victim over five years, and five one-year policies were successively in force, each with a self-insured retention. How many retentions are to be applied? The plurality's logic gives the answer 20. Judge Graffeo would say one. The Ninth and Fifth Circuits would say five, and I think they are correct.

GRAFFEO, J. (concurring in part and dissenting in part). I agree with the plurality that the insurer did not waive its

"multiple occurrence" and "pro rata allocation" arguments by failing to timely assert these issues in its disclaimer letters. I also concur with its conclusion that pro rata allocation of the loss across all implicated policies is appropriate.[1] But because I do not believe that application of the "unfortunate event" test results in a finding that the continuous course of sexual abuse of a single child by the same negligently hired and supervised priest amounted to multiple occurrences, I respectfully dissent from that part of the plurality decision.

## I

Under the National Union policy, the term "occurrence" is defined as "an accident including continuous or repeated exposure to substantially the same general harmful conditions." This definition is similar to the clause we interpreted in *Appalachian Ins. Co. v General Elec. Co.* (8 NY3d 162 [2007]), where we applied the unfortunate event test to hold that General Electric could not aggregate, on an annual basis, asbestos-related personal injury claims brought by numerous individuals who were exposed to asbestos-containing steam turbines installed at more than 22,000 sites throughout the United States.

We made clear in *Appalachian* that resolving the occurrence question is a two-part process. First, the court must identify the incidents or occasions giving rise to injury or loss. Second, it must apply the unfortunate event test to determine whether they constitute one occurrence. Under the second inquiry, the court considers "whether there is a close temporal and spatial relationship between the incidents . . . , and whether the incidents can be viewed as part of the same causal continuum,

---

**1.** The pro rata allocation and multiple occurrence issues are distinct. Under the allocation issue, the question is whether the insurer is entitled to demand that the loss be apportioned across all seven policies in effect when the abuse occurred, rather than covered by only one or two at the election of the insured. Resolution of the allocation issue is significant, no matter how the Court decides the occurrence question, because the Diocese indicates that several of the primary policies contained a sexual abuse exclusion that would preclude coverage for losses in those policy years. If the Diocese is correct about the scope of the policy exclusions (an issue not before us), since we have concluded that the claim must be allocated across all seven policy periods, it appears that the Diocese may recover only the pro rata share attributable to the first two policies which allegedly had narrower sexual abuse exclusions and therefore may cover the loss. Resolution of the occurrence issue involves a different question: how many self-insured retentions will the Diocese have to pay to gain access to the pro rata coverage allegedly available under the policies that had the narrower exclusions.

without intervening agents or factors" (*id.* at 171-172). In *Appalachian*, we explained that "the incident that gave rise to liability was each individual plaintiff's continuous or repeated exposure to asbestos" (*id.* at 173 [internal quotation marks omitted]). Applying the unfortunate event factors, we concluded there were numerous occurrences because, even assuming the causal continuum element was met, "the incidents share few, if any, commonalities, differing in terms of when and where exposure occurred, whether the exposure was prolonged and for how long, and whether one or more GE turbine sites was involved" (*id.* at 174). This case is a far cry from *Appalachian*.

Here, plaintiffs in the underlying personal injury action sought recovery from the Roman Catholic Diocese of Brooklyn based on its alleged negligent hiring and supervision of a priest who, over a span of more than six years, repeatedly engaged in a course of sexual abuse of a particular child. Just as the incident or occasion giving rise to injury or loss in *Appalachian* was the repeated or continuous exposure of an individual plaintiff to asbestos, here the incident or occasion was the repeated or continuous exposure of the child to the same negligently hired and supervised priest.

Although the course of sexual conduct allegedly engaged in by the priest constitutes intentionally tortious (indeed criminal) behavior, the Diocese was sued for its own allegedly negligent acts: inappropriate hiring, retention and supervision of the priest. Viewed from the perspective of the Diocese—the entity that purchased insurance coverage—the incident giving rise to liability was the child's repeated molestation by the same priest, which was a consequence of her exposure to the same risk of harm created by the Diocese (i.e., an allegedly negligently hired and improperly supervised employee). As noted in *Appalachian*, the fact that the exposure was repeated and continued for several years "does not make it any less the operative incident or occasion giving rise to liability" (8 NY3d at 174). In reaching this conclusion, I do not conflate the cause of the incident with the incident itself as the plurality suggests. In fact, I apply the unfortunate event test to the same "incident or occasion" as the plurality—the priest's sexually abusive contact with the child. Our differences arise from disparate views concerning the policy language and the application of the unfortunate event factors.

Contrary to the conclusion reached by the plurality, by defining a single occurrence as encompassing "continuous or

repeated exposure to substantially the same general harmful conditions," the insurance contract included language in the policy evincing an intent to aggregate certain bodily injury events that might otherwise be viewed as distinct incidents. The purpose of the unfortunate event test is to determine when such aggregation is appropriate.

Applying the unfortunate event factors, I conclude that there was one occurrence. First, the claim for which the Diocese seeks coverage arose from the bodily injury of one party. None of the possible tests discussed in *Appalachian* (the proximate-cause approach, the one-accident-per-person approach, or the unfortunate event test) would have resulted in separating into multiple occurrences a claim by one complainant suing based on exposure to the same injury-producing condition (absent language restricting the duration of an occurrence, which I discuss below). Certainly, application of the test we adopted in *Appalachian* does not require that result.

Although the abuse incidents continued for more than six years, there were no substantial periods of intervening time when there was no abuse. Rather, according to the submissions in the personal injury action, for several of the years encompassing instances of abuse the child's mother worked as a cook at the rectory at least five days a week and sometimes on weekends; she would pick the child up at school and bring her to work every day, where the child would remain until the mother went home, sometimes late at night. The infant plaintiff indicated that the priest's inappropriate sexual contact occurred virtually every day that the child was at the rectory and sometimes multiple times in the same day. Thus, there is no question that the sexual abuse incidents were sufficiently frequent and connected (i.e., temporally close to one another) to meet the requirements of the unfortunate event test.

Nor is there a "spatial" disconnect, to the extent that factor can be applied here. Most of the abuse incidents occurred at the rectory—all arose from the child's exposure to the same priest, which came about as a result of his employment with the Diocese where her mother worked. And, at least insofar as the Diocese's liability is concerned, the incidents had a common cause—the Diocese's negligent hiring, retention and supervision of the priest. It is true, as the plurality notes, that the priest engaged in numerous acts of sexual abuse—the Diocese's alleged negligence was certainly not the sole cause of the child's

injuries. But this did not disrupt the causal link between the Diocese and the incidents because the Diocese was held liable for a continuous course of conduct—negligent hiring, supervision and retention of the priest—that created the occasion for the abuse. Just because the Diocese's negligence was not the sole cause of the injuries does not mean that there was a break in the causal chain between its acts or omissions and the incidents underlying the injured plaintiff's loss. I therefore conclude that the sexual abuse constituted one occurrence under the unfortunate event test.

Purporting to apply that test, the plurality instead holds that there were multiple occurrences—although the decision is somewhat unclear as to whether there were multiple occurrences per policy or whether it is aggregating abuse incidents within each policy year, resulting in one occurrence per policy. The difference between these two conclusions can be significant (especially when there is an excess insurer that has also provided coverage on a "per occurrence" basis, as is the case here). Reading between the lines, because it emphasizes the disparate nature of each sexual abuse incident, and there were numerous assaults during each policy period, it appears that the plurality concludes that there were multiple occurrences per policy. If the priest sexually abused the child 20 times in a given year (and this is an extremely low estimate given her allegations), then under the plurality's one-occurrence-per-abuse-incident analysis the Diocese would be required to pay 20 $250,000 self-insured retentions for that period—even though its liability emanated from a single lawsuit involving one injured party who was exposed to the same repeated, virtually-continuous risk of harm.

I cannot imagine that this was what the parties had in mind when the coverage was purchased. Certainly, the policy contemplated that the Diocese might seek coverage in any given policy period for more than one occurrence—in the course of a year, the Diocese might be liable for several different injury-producing events (e.g., a parishioner might fall on the church steps; a child might be injured at a Diocesan school playground; a tree located on church property might fall on a visitor's vehicle resulting in property damage). But what the parties would not have anticipated was that a single lawsuit brought by one injured plaintiff who suffered damages as a result of the same harmful condition would be treated as multiple occurrences within each policy period. While each sexual abuse incident may well have constituted a separate "bodily injury," the parties

agreed that the self-insured retention would be triggered by an "occurrence." Since the policy defines an occurrence as the "continuous or repeated exposure to substantially the same general harmful conditions," and the temporal, spatial and causal analysis indicates that the abuse was part of one unfortunate event, there was only one occurrence.

## II

That being said, my conclusion that the course of sexual conduct involving the infant plaintiff involved one occurrence under the unfortunate event test does not necessarily resolve the question of how many self-insured retentions the Diocese was required to pay when it sought coverage under more than one policy. Parties to insurance contracts are free to fashion self-insured retention provisions that require that a retention be paid every time a policy's coverage is triggered, regardless of whether this is based on the same injury-producing condition. The question is whether that occurred here.

As the plurality explains, each of the National Union policies provide coverage for bodily injury only if it is "caused by an occurrence" and "occurs during the policy period." Here, since there was bodily injury (sexual abuse incidents) caused by an occurrence that spanned multiple policy periods, there is no question that multiple coverage provisions were triggered. However, in these policies, the Diocese's obligation to pay a self-insured retention does not hinge on whether there has been "bodily injury" within a policy period—rather, the policies require the payment of one self-insured retention per *occurrence*.

In many insurance policies, an occurrence cannot span more than one policy year because the definition of "occurrence" contains language restricting its temporal scope. This was true in *Appalachian* where the policies defined "occurrence" as "an accident, event, happening or continuous or repeated exposure to conditions which unintentionally results in injury or damages *during the policy period*" (8 NY3d at 172 [emphasis added]). But in this case, though the parties used temporally limiting language to define coverage for "bodily injury," the definition of "occurrence" contains no similar language restricting its duration.[2] By agreeing that one self-insured retention would be owed

2. In this regard, Judge Smith's concurrence fails to recognize the relevant language in the insurance contract. He suggests that there is no distinction

*(n. cont'd)*

per "occurrence" and failing to include language restricting an occurrence to a single policy term, the insurance agreement required the Diocese to pay only one self-insured retention for an occurrence even if it spanned multiple policy years—triggering multiple policies—as occurred here. I would therefore modify the decision of the Appellate Division by issuing a declaration to that effect.

The cases from other jurisdictions cited by National Union are not to the contrary. Most involved insurance policies in which the definition of "occurrence" included a clause comparable to the restrictive "during the contract term" language found in *Appalachian* (and present in many if not most occurrence-based policies)—which is inexplicably absent here. This was true in *Interstate Fire & Cas. Co. v Archdiocese of Portland in Or.* (35 F3d 1325 [9th Cir 1994]) where an excess insurer brought suit to resolve a dispute concerning the primary coverage available for a settlement involving the repeated sexual abuse of a single child that continued over four policy periods. The excess insurer contended that each act of molestation was a separate occurrence, meaning that, for each incident of sexual abuse, the Diocese would be required to pay a self-insured retention and the primary insurer would have to exhaust its per-occurrence limit. The Diocese maintained that all four years of molestation involved one occurrence, implicating one self-insured retention and one per-occurrence primary policy limit. The 9th Circuit rejected both arguments based on the language of the policy, which defined occurrence as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury . . . *during the policy period*" (*id.* at 1329 [emphasis added]).

---

between a covered "injury" and an "occurrence" (Smith, J. concurring op at 156)—but in this policy the terms "bodily injury" and "occurrence" have separate functions and different definitions. It is only an occurrence that triggers the obligation to pay a self-insured retention, with one self-insured retention owed for each occurrence. Although he agrees that there was one occurrence under the unfortunate event test, Judge Smith does not explain why he nonetheless concludes that there were multiple occurrences—one per policy period—for purposes of payment of the self-insured retention. His reliance on *Consolidated Edison Co. of N.Y. v Allstate Ins. Co.* (98 NY2d 208 [2002]) is misplaced because in that case we did not determine either the number of occurrences or the scope of a self-insured retention requirement, nor indicate that "a new retention applies to the 'injury' suffered each year" (Smith, J. concurring op at 156); the case addresses a different question—how a loss arising from a continuing harm should be allocated.

Similar to my analysis, the 9th Circuit reasoned: "it is the repeated 'exposure' of the [child] to the negligently supervised priest, resulting in injury, that provides the basis for indemnification" and, as such, "it is 'exposure' to such conditions . . . that constitutes the occurrence" (*id.*) It went on to explain:

> "Although the definition of occurrence provides that multiple exposures stemming from the same general conditions can constitute a single occurrence, the assuring clause makes it clear that this is true only of multiple exposures occurring *during the period of insurance*" (*id.* at 1329-1330).

Because the language in the pertinent policies precluded an occurrence from spanning more than one policy period, the court determined there was one occurrence per policy year. The plurality cites the case (plurality op 152-153 n 5) but misunderstands it, suggesting that the 9th Circuit refused to group together individual acts of sexual abuse when, in fact, the court aggregated all acts occurring within a single policy year as one occurrence and found four total occurrences only because of the policy's durational restriction on the scope of an occurrence. The *Interstate Fire* analysis is sound but this case is distinguishable because the policies under review fail to restrict the duration of an occurrence.

Since I concur with the plurality's ultimate conclusion on pro rata allocation, there is no reason for me to discuss allocation— other than to clarify the difference between the occurrence and allocation issues. The distinction I draw between this case and *Interstate Fire* (which also did not resolve an allocation issue) is not related to our loss allocation rule but pertains to the occurrence issue and is based on differences in the policy definitions of an "occurrence." Although there are elements of the occurrence and allocation questions that overlap (e.g., both consider causation), whether pro rata allocation is appropriate involves a distinct inquiry that does not necessarily depend on the number of occurrences involved.[3] When a policy contains language restricting the duration of an occurrence to a single policy period, a continuous harm can constitute multiple occurrences

---

**3.** Absent policy language to the contrary, pro rata allocation is appropriate if (1) the loss arose as a result of a continuous harm spanning multiple policy periods; and (2) it is difficult if not impossible to discern the extent of injuries attributable to any one policy period (*Consolidated Edison*, 98 NY2d at 221, *supra*). I agree with Judge Smith that it is hard to reconcile the plurality's view that the sexual abuse incidents are too causally attenuated to

*(n. cont'd)*

(one per policy period) but still warrant pro rata allocation of the loss across all implicated policies, as appears to have been the case in *Consolidated Edison Co.* (98 NY2d 208 [2002], *supra* [pro rata allocation deemed appropriate in case where occurrence definition contained typical "during the policy period" restriction]). And certainly where, as here, there is no language restricting the duration of an occurrence, a continuous harm that causes losses across multiple policy periods can constitute a single occurrence and also present an appropriate candidate for pro rata allocation.

The bottom line is that, whether based on the policy language or some other analysis, most negligent hiring and supervision cases arising from repeated acts of child sexual abuse generally fall into one of two categories. In cases where the abuse did not span more than one policy period, courts have held that there was one occurrence per injured plaintiff (*State Farm Fire & Cas. Co. v Elizabeth N.*, 9 Cal App 4th 1232, 12 Cal Rptr 2d 327 [1992] [where several children were abused by husband of child care provider multiple times over a one-month period, insured's liability to each child constituted a single occurrence]; *S.F. v West Am. Ins. Co.*, 250 Va 461, 463 SE2d 450 [1995] [where an employee sexually assaulted more than one person in separate incidents, each exposure to a new victim was a new occurrence]; *see generally H.E. Butt Grocery Co. v National Union Fire Ins. Co. of Pittsburgh, Pa.*, 150 F3d 526 [5th Cir 1998] [did not involve a course of sexual abuse but, in case where employee assaulted two children on two separate occasions one week apart, there was one occurrence per injured plaintiff]). In cases where the definition of occurrence included durationally-restrictive language and the abuse spanned more than one policy year, courts have concluded that there was one occurrence per injured plaintiff per policy year (*see Society of R.C. Church of Diocese of Lafayette & Lake Charles, Inc. v Interstate Fire & Cas. Co.*, 26 F3d 1359 [5th Cir 1994] [where two priests at one Diocese abused 31 children over seven years, there was one occurrence per child per policy year]; *Roman Catholic Diocese of Joliet, Inc. v Interstate Fire Ins. Co.*, 292 Ill App 3d 447, 685 NE2d 932 [1997] [relationship between priest and minor spanning two policy years constituted one occurrence per policy period]). As

---

be aggregated as a single occurrence (even within the same policy period) with its subsequent treatment of the pro rata allocation issue, which depends on the conclusion that the entire loss stems from the same continuous harm spanning multiple policy periods.

far as I can detect, none of the cases involving a course of sexual conduct against a single child have employed the analysis adopted by the plurality here, which suggests that each act of sexual abuse involving the same victim constitutes a separate occurrence. Hence, because I find the plurality approach on the occurrence issue to be inconsistent with the policy language and the pertinent precedent, I respectfully dissent from that part of the decision.

Judges READ and PIGOTT concur with Judge RIVERA; Judge SMITH concurs in result in an opinion; Judge GRAFFEO concurs in part and dissents in part in an opinion; Chief Judge LIPPMAN taking no part.

Order affirmed, with costs, and certified question answered in the affirmative.